[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
CONSOLIDATED MEMORANDUM OF DECISION
These are consolidated cases — heard together at a consolidated evidentiary hearing — involving a real estate transaction that went very, very sour. The defendant in both actions is Mary Lou Sciola ("Sciola"), who owns a 6-apartment building at 375 Waterville Street in Waterbury ("the building"), that, as will be seen, never quite got sold. The plaintiffs in the first action are Nasir, Internim, and Isni Kica ("the Kicas"), three cousins of Albanian extraction, who formed a partnership to purchase the building. The plaintiff in the second action is Advantage Realty Group, Inc. ("Advantage") which acting as Sciola's real estate broker, procured the Kicas as persons ready, willing, and able to purchase the building and which now wants its commission.
This case is remarkable for the number of unrelated witnesses who told completely dissimilar stories on the stand about relatively recent and seemingly memorable events. After carefully sifting the testimony and examining the exhibits, the court is able to find certain facts by the civil standard of a fair preponderance of the evidence. These facts are sufficient to compel a conclusion that the Kicas were ready, willing, and able to buy the building and that judgment should consequently be entered for the plaintiffs in both actions.
On April 18, 1989, Sciola and Advantage signed a contract entitled Exclusive Right To Sell, giving Advantage an exclusive right to sell the building for a price of $200,000. In the contract, Sciola agreed to pay Advantage as a fee for its CT Page 6097 services 6% of the agreed upon sales price if during the term of the contract either party "finds a buyer ready, willing and able to buy the Listed Property either for the Listed Price or for any other price accepted by [Sciola]". Advantage agreed to make diligent efforts to sell the building and to submit it to the Multiple Listing Service of Greater Waterbury, Inc. ("MLS"). (Ex. 12.) At about this time, Advantage prepared an MLS listing form describing the building. (Ex. 11.) All of its apartments were described as "Very Nice." According to the listing, all new wall to wall carpeting and linoleum was "to be installed." A "sewer backup" that had caused "water in Cellar" had "since been fixed and is no longer a problem." "Debbie" who lived on the first floor left, was said to be "always home and has keys." All of this information came from Sciola.
Sciola and Advantage signed subsequent Exclusive Right To Sell contracts on September 8, 1989 (Ex. 13) and March 4, 1990 (Ex. 14). The September 8, 1989 contract contained a listed price of $195,000. The March 4, 1990 contract contained a listed price of $184,900. The March 4, 1990 contract contains some additional language not in the earlier contracts. By this latter contract, Sciola agreed to pay Advantage its 6% fee not only if it found a ready, willing and able buyer, but also if either party "obtains a binding enforceable agreement between [Sciola] and a buyer to sell/purchase the Listed Property."
The Kicas wished to buy a building for investment purposes. In late February or early March 1990, the Kicas were shown the building in question by an associate broker employed by Advantage. It is not altogether clear what the Kicas saw in this viewing (or in a second viewing that some witnesses contend also happened at about this time), but it is clear that they were unable to see the apartment on the first floor left. Sciola had commenced a summary process action against the tenant of that apartment, Deborah Blais, Sciola v. Blais, No. SPWA9001-9019. On March 5, 1990, the parties in Sciola v. Blais filed a Stipulated Agreement (Ct. Ex. 1) that a judgment for possession was to enter in favor of Sciola with a stay of execution through June 30, 1990, on condition, inter alia, that Blais pay $2,910 on or before March 31, 1990. It was further agreed that Blais allowed reasonable access to Sciola and her agents to make necessary repairs. Judgment was entered to this effect by the Hon. Anthony DeMayo on that date. It is not clear whether the Kicas' initial showing occurred before or after that date, but Sciola had told Advantage at about this time that she would not enter the first floor left apartment because an eviction was going on. The Kicas were consequently unable to enter the apartment.
On March 15, 1992, the Kicas, Sciola, and Advantage (by its president, Judith Caputo) signed a contract for the purchase of CT Page 6098 the building (Ex. 2.) The purchase price was agreed to be $170,000. An initial deposit of $500 was made and an additional deposit of $7,500 was to be made within 10 days. (This sum was paid; the total deposit is thus $8,000.) Sciola agreed to "be liable for the full commission due" to Advantage upon her default and to "be liable for any reasonable attorney's fees incurred by the Purchaser and Broker in enforcing this contract." The Kicas were given the "right to final inspection prior to closing." Sciola agreed that Advantage was "the procuring cause for the sale" and agreed to pay "the real estate commission" to Advantage. In a signed Addendum to the contract, also dated March 15, 1990, Sciola made several additional express promises. She agreed "to remove debris from . . . basement prior to closing." She agreed "to repair porch roof, to best of [her] ability, prior to closing." She further represented that the `first floor (left) tenant, is now in the process of a court ordered eviction . . . [and] was given 60 days from March 19, 1990 in which [to] vacate said premises."
Although the exact date of Ms. Blais' departure is disputed, all parties agree that the first floor left apartment was vacated by no later than May 19, 1990.
On April 30, 1990, the Kicas obtained a mortgage commitment from the Bank of Waterbury. (Ex. 1.) The commitment by its terms expired May 31, 1990. The closing was set for 8:00 a.m. on May 30, 1990. The final inspection was scheduled for the evening of May 29, 1990.
Several important events and nonevents occurred prior to the final inspection. As already noted, the first floor left apartment was vacated by the tenant by no later than May 19, 1990. The door to that apartment was locked. The apartment itself was not "very nice" as Sciola had represented to Advantage, but was in deplorable condition — with subflooring in the bathroom, ancient linoleum, and kitchen pipes broken and held together with duct tape. After Blais left the apartment, it was ransacked. (Blais had previously filed a special defense in her housing case that the premises were "not fit for human habitation." (Ct. Ex. 2.) (Answer of Feb. 14, 1990.) The porch roof was not fixed — in fact, the process of fixing it was never even begun. This was not a matter of a roof needing a few shingles. There was a large rotted hole in a high roof covering the back porch of the building. About a week before the closing, Sciola called Judith Caputo, the president of Advantage. Sciola stated that she had not cleaned out the basement or repaired the roof and was not going to spend another penny on the property. She further stated that she did not want to let the Kicas see the first floor left apartment because "It's a deplorable pigsty." At about this time, a lock was placed on the previously unlocked basement door. CT Page 6099
The final inspection occurred on the evening of May 29. The Kicas found the porch roof entirely unrepaired. They were unable to gain access to either the first floor left apartment or the basement because those parts of the building were locked, and Sciola had not given Advantage the keys.
At the closing on the morning of May 30, the Kicas had the necessary funds to close, and the closing documents were ready to be signed. The Kicas proposed that Sciola post an escrow in the amount of $10,000 to insure them against the potential expenses they faced in connection with the porch roof, the basement, and the first floor left apartment. Sciola countered with an offer of $2,000, which she later increased to $3,000. The Kicas refused these offers. The parties were at an impasse, and the meeting broke up because Sciola's attorney had to go to court. The closing documents were never signed.
Sciola made no attempt to obtain the services of a locksmith. She did nothing on May 30 to allow the Kicas further entry into the building. At 12:25 p.m. on May 31, she left a telephone message with her attorney stating "she has to close on the house tomorrow. If not, a lien is going on it Monday [June 4]." (Ex. 35.)
On June 1, a friend of Sciola's brought a set of keys to Advantage. Lana Ogrodnik, an Advantage real estate broker, went to the building and tried the keys, but none of them worked. Ms. Ogrodnik then left a message to that effect on Sciola's telephone answering machine. Sciola never called her back or gave her any additional keys or access. The Kicas' mortgage commitment had by this time already expired, and Sciola's own deadline to her attorney was about to expire as well. The closing was never consummated.
Although the Kicas and Advantage have distinct claims against Sciola, their claim arises from the same general fact pattern and, for practical purposes, jointly turn on whether the Kicas were ready, willing, and able to purchase the building. The court finds that the Kicas were, in fact, ready, willing, and able. Although Sciola did her best to raise some doubt as to the Kicas' financial ability to purchase both his building and an unrelated building that they purchased on May 30, the court finds that they had ample financing to proceed with the closing and purchase the building in question. The Kicas were psychologically ready, willing, and able as well. They attended the closing, paid closing costs in the form of points and attorney's fees, and were quite willing to go through with the closing if Sciola deposited a reasonable sum in escrow to insure them against the potential expenses they faced. Under the circumstances of this case, $10,000 was a reasonable escrow amount, and the $2,000 to $3,000 CT Page 6100 proposed by Sciola was not. Ultimately, the Kicas were ready, willing, and able to close on appropriate terms, and Sciola was not.
The $10,000 escrow amount proposed by the Kicas was particularly appropriate because of the state of the porch roof. Sciola implicitly argues in her brief that this defect should not be considered by the court because it (unlike the locked apartment and basement) is not specifically mentioned in the complaint. The Kicas' complaint, however, claims that, "Although the [Kicas] requested the defendant to convey the premises in accordance with the terms of the agreement, the defendant refused to do so." As already discussed, the agreement specifically provided that Sciola would repair the porch roof to the best of her ability prior to closing. The porch roof, which was extensively rotted, had not been repaired at all by the closing date. The plaintiffs are not foreclosed by their pleading from proving this fact.
Sciola next relies on the undoubted rule that "time is ordinarily not of the essence in transactions involving real property." Kakalik v. Bernardo, 184 Conn. 386, 393, 439 A.2d 1016
(1981). The conclusion she draw, from this maxim is that the locked first floor apartment (she does not mention the locked basement and the unrepaired porch roof) should not have been fatal because she "had a reasonable period of time following the May 29, 1990 final inspection date in which to obtain access to the first floor left apartment for the perspective [sic] purchasers." Defendant's brief at 13. Viewed in the abstract this is a fair statement of the law. It leaves out, however, several factors of the utmost importance to this case. First, the unrepaired porch roof would take some considerable time to fix, and the facts strongly indicate that Sciola was near going to fix it no matter how much time she had. Second, the plaintiffs' mortgage commitment was to expire on May 31. And third, Sciola herself told her attorney that the closing had to be by June 1, or a lien was going to be placed on the house.
In spite of the general note that time is not of the essence in real estate contracts, it should be considered of the essence "[w]here, from the nature of the subject matter . . . the treating of time as a non-essential will produce a hardship, and delay by one party in completing or complying with a term would necessarily subject the other party to serious injury or loss." Blaustein v. Weiss, 409 So.2d 103, 105 (Fla. Dist Ct. App. 1982). Given the totality of the circumstances present in this case, delay would plainly have subjected the Kicas to serious injury or loss. Sciola's argument that time was not of the essence must fail under these circumstances.
"A contracting party expects that the other party will not CT Page 6101 only perform his duties under the contract when the time for performance comes, but will do nothing substantially to impair this expectation before that time comes." Restatement (Second) of Contracts, introductory note, ch. 10, topic 3 (1981). "Repudiation can occur either by a statement that the promisor will not perform or by a voluntary, affirmative act that indicates inability or apparent inability, substantially to perform." Gilman v. Pedersen, 182 Conn. 582, 584, 438 A.2d 780 (1981). There is ample evidence of an abundance of such voluntary, affirmative acts by Sciola in this case. The unrepaired porch roof, the locked apartment and basement, Sciola's statement to Caputo — that among other things — she was not going to spend another penny on the property, Sciola's message to her own lawyer that the closing had to be by June 1 or not at all, and the unworkable keys that Sciola delivered to Advantage on June 1 all point to a single conclusion. The Kicas had more than sufficient reason to doubt that these serious defects could be remedied either by the contemplated closing date or, under the circumstances, within any reasonable time thereafter.
For the reasons described above, the court finds that the Kicas were ready, willing and able to purchase the building both at the time the contract was signed and thereafter, that Sciola breached the contract by her voluntary, affirmative acts, and that her breach excused the Kicas from further performance. Both Advantage and the Kicas must consequently prevail in their respective claims against Sciola, and Sciola's counterclaim must be denied.
The issue of damages must now be discussed. Advantage is entitled to a commission of 6% of the contract price of $170,000.00, or $10,200. The Kicas have proven that they have sustained the following damages the deposit of $8,000; a fee of $750 that they paid to the lender's attorney; a fee of $525 that hey paid to their on attorney; and bank fees (points) that they paid in the amount of $1,270. The Kicas are thus entitled to total damages of $10,545.
The final issue to be decided is whether Advantage and the Kicas are entitled to attorneys fees. The contract (Ex. 2) provides that "Seller shall be liable for any reasonable attorney's fees incurred by the Purchaser and Broker in enforcing this contract." In addition, the Exclusive Right To Sell in effect at the time of the events in question (Ex. 14) provides that, "If you have to go to court: or arbitration to enforce this contract, you have the right to be paid back for all your costs and expenses allowed by law, including attorney's fees if you win." "You" is defined as "the `Broker.'" Since the Exclusive Right To Sell gives Advantage the right to a 6% commission if it finds a ready, willing, and able buyer, and since Advantage had to CT Page 6102 go to court to enforce this right, it is plainly entitled to attorney's fees under that contract alone given the fact that it has prevailed. As to the contract signed by the Kicas, Sciola argues that the contractual term "enforcing" refers exclusively to an action for specific performance rather than an action, like this one, for monetary damages. Suffice it to say that, while the "enforcement" of a contract may include specific performance, the term is not limited to that narrow meaning. As the Supreme Court of the United States has recently explained with respect to a civil rights statute, 42 U.S.C. § 1981, which empowers all persons with an equal right to "enforce contracts," this guarantee "embraces protection of a legal process, and of a right of access to legal process, that will address and resolve contract-law claims." Patterson v. McLean Credit Union, 109 S.Ct. 2362, 2373
(1989). Such a right plainly includes the right to seek monetary damages for losses incurred as a result of a breach of a contract. Any other interpretation would needlessly restrict the rights of persons injured by breaches of contract to assert their contract-law rights to damages before the courts. Attorneys fees may consequently be awarded to both Advantage and the Kicas. The amount of such fees must be determined at a subsequent hearing, unless the parties are able to reach an agreement as to that amount.
Judgment shall enter in No. 097592 against Sciola and in favor of the Kicas in the amount of $10,545, plus attorney's fees and costs.
Judgment shall enter in No. 100603 against Sciola and in favor of Advantage in the amount of $10,200, plus attorney's fees and costs.
Dated at Waterbury, this 23rd day of June, 1992.
/s/ Blue, J. JON C. BLUE Judge of the Superior Court